# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BRENDA G. JONES,** | ) | |
|    Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:12cv00028 |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | **REPORT AND RECOMMENDATION** |
|   **Acting Commissioner of** | ) | |
|   **Social Security,** | ) | |
|    Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Brenda G. Jones, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Jones protectively filed an application for DIB on January 8, 2008,[2] alleging disability as of March 1, 2004, due to diverticulitis, colon problems, severe anxiety and depression, arthritis, insomnia and fatigue. (Record, ("R."), at 123-24, 159, 170, 187, 191.) The claim was denied initially and on reconsideration. (R. at 69-71, 74-77, 79-81.) Jones then requested a hearing before an administrative law judge, ("ALJ"), (R. at 82.) The hearing was held on August 18, 2010, at which, Jones was represented by counsel. (R. at 31-64.)

By decision dated August 30, 2010, the ALJ denied Jones's claim. (R. at 11-26.) The ALJ found that Jones met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2004.[3] (R. at 13.) The ALJ also

---

[2] The record actually contains two protective filing dates, January 8, 2008, and October 17, 2008. (R. at 166, 187.)

[3] Therefore, Jones must show that she became disabled between March 1, 2004, the alleged onset date, and December 31, 2004, the date last insured, in order to be entitled to DIB

found that Jones had not engaged in substantial gainful activity since March 1, 2004, the alleged onset date. (R. at 13.) The ALJ found that the medical evidence established that, through the date last insured, Jones suffered from severe impairments, namely shoulder and back pain, diverticulosis, torn meniscus of the left knee, status-post left knee arthroscopy with debridement of the lateral meniscal tear, depression, left ankle fracture and obesity, but she found that Jones did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ also found that, through the date last insured, Jones had the residual functional capacity to perform a limited range of simple, noncomplex light work[4] that did not require her to climb, lift overhead or operate foot controls with her lower extremities and that did not require more than occasional reaching overhead, crouching, crawling and stooping. (R. at 15.) Thus, the ALJ found that, through her date last insured, Jones was unable to perform her past relevant work. (R. at 24.) Based on Jones's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including the job as a short order cook. (R. at 24-25.) Thus, the ALJ found that Jones was not under a disability as defined under the Act and was not eligible for benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(g) (2013).

After the ALJ issued her decision, Jones pursued her administrative appeals,

---

benefits.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2013).

(R. at 7), but the Appeals Council denied her request for review. (R. at 1-5.) Jones then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2013). The case is before this court on Jones's motion for summary judgment filed April 29, 2013, and the Commissioner's motion for summary judgment filed July 2, 2013.

*II. Facts*

Jones was born in 1948, (R. at 123), which classified her as a "person of advanced age" under 20 C.F.R. § 404.1563(e) at the time of the ALJ's decision. Jones obtained her general equivalency development, ("GED"), diploma and has past relevant work experience as a cook for the school system. (R. at 42, 160, 164.)

Vocational expert, John Newman, was present and testified at Jones's hearing. (R. at 57-63.) Newman classified Jones's work as a school cook as medium[5] and skilled. (R. at 58.) Newman stated that these skills were not transferrable to the sedentary level; however, he stated that these skills could be transferred to the occupation of short order cook, which is classified as light and semi-skilled. (R. at 58.) Newman was asked to consider a hypothetical individual who could perform simple, noncomplex light work, who could not climb, who could occasionally reach overhead, who could not lift objects overhead, who could occasionally crouch, crawl and stoop and who could not operate foot controls. (R. at 59-60.) Newman stated that such an individual could perform the job of a short

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2013).

order cook. (R. at 61.) In addition, Newman stated that such an individual could also perform jobs as a food preparation worker, a dining room and cafeteria attendant, a packer, an assembler and an inspector, tester and sorter. (R. at 61-62.) He stated that each of these jobs existed in significant numbers in the national economy. (R. at 61-62.) When asked to assume an individual with the same limitations as the previous hypothetical, but who would be unable to perform a work task for eight hours a day or who would miss approximately two work days a month, Newman stated that there would be no jobs available that such an individual could perform. (R. at 62-63.)

In rendering her decision, the ALJ reviewed medical records from Kingsport Day Surgery; Wellmont Holston Valley Medical Center; Sapling Grove Surgery Center; Holston Medical Group; Dr. Joseph Duckwall, M.D., a state agency physician; Dr. Richard Surrusco, M.D., a state agency physician; and Meadowview Diagnostic Outpatient Center.

The record indicates that Jones was treated by various physicians at Holston Medical Group, including Dr. Jeffrey R. Vaughn, M.D., Dr. Mark Santman, M.D., Dr. Steven M. Adkins, M.D., Dr. Larry T. Wilson, M.D., Dr. Lauren Franklin, M.D., Dr. Eldridge Burns, M.D., Dr. Steven M. Holt, M.D., and Dr. Thomas V. Thomas, M.D. (R. at 319-593.)

On April 8, 1999, while Jones was employed as a cook, she reported to Dr. Jeffrey R. Vaughn, M.D., that she had chronic low back pain for which she had intermittent chiropractic treatments with generally good results. (R. at 508.) Dr.

Vaughn noted tenderness in the trapezial musculature that he diagnosed as upper back muscle strain and treated with an injection of Celestone with Lidocaine. (R. at 508.) Dr. Vaughn noted that Jones's straight leg raising was negative, her knee reflexes were normal, and there was only mild tenderness in her lower lumbar spine. (R. at 508.) On April 14, 1999, Jones reported that her lower back was doing much better, but that she had continued problems with her mid and upper back. (R. at 506.) Dr. Vaughn reviewed Jones's x-rays that showed mild arthritic changes of the lumbosacral spine and a normal cervical spine. (R. at 506.) Dr. Vaughn recommended physical therapy for four to six weeks and wrote a note excusing Jones from her job as a cook for the remaining four weeks of the school year. (R. at 506.) A year later, when Jones returned to Dr. Vaughn on April 10, 2000, she expressed her concern that she had been exposed to a staph infection when caring for an elderly patient. (R. at 504.) She voiced no complaints of back or neck pain. (R. at 504.)

On November 7, 2000, Jones was seen for complaints of bronchitis, and she voiced no complaints of musculoskeletal pain. (R. at 501.) On December 17, 2002, Jones complained of arthritic type pain, headache, elevated blood pressure and ear pain. (R. at 499.) She requested samples of Celebrex. (R. at 499.) On January 10, 2003, Jones reported that she had taken samples of Celebrex for her arthritic pain, which helped her. (R. at 496-97.) On January 24, 2003, Jones reported that her back pain had resolved. (R. at 492.) Jones's blood pressure was reported as stable. (R. at 493.) On February 24, 2003, Jones reported that her osteoarthritic pain remained well-controlled with Celebrex. (R. at 490.) On examination, Jones had a steady gait, was free of acute injury and was able to move all extremities with full

range of motion and no pain on movement. (R. at 490.)

On April 1, 2003, Dr. Mark Santman, M.D., evaluated Jones for left knee pain. (R. at 480-81.) She denied depression and anxiety. (R. at 480.) Jones had full range of motion at the hip, knees and ankles without crepitation or pain. (R. at 480.) X-rays of Jones's knees showed some moderate osteoarthrosis of the left knee, as well as decreased joint space and peripheral osteophyte formation. (R. at 481.) An MRI showed a left knee bucket-handle lateral meniscus tear and osteoarthritis. (R. at 481.) Jones underwent a left knee arthroscopy with debridement on April 7, 2003. (R. at 218-19, 479.) Following the surgery, Jones did well and continued to report improvement. (R. at 475, 477, 479.) She had full range of motion at the hip, knee and ankle without pain, her motor strength was normal, her sensation was intact, and there was no edema present. (R. at 475-79.)

On July 24, 2003, Jones complained of increased stress and anxiety related to work. (R. at 470-71.) Her affect was appropriate, and she had normal psychomotor function. (R. at 470.) She was prescribed Lexapro. (R. at 471.) On October 24, 2003, Jones complained of left lateral ankle pain and swelling after slipping. (R. at 391-92.) An x-ray of Jones's left ankle revealed a lateral malleolus fracture. (R. at 393.) Dr. Steven M. Adkins, M.D., prescribed an air cast and crutches. (R. at 391.) By October 31, 2003, Jones reported that her pain was resolving, and by December 1, 2003, she reported being pain free, and her cast was removed. (R. at 462, 464.) On January 26, 2004, it was reported that Jones's fracture was clinically healed and she had returned to her previous level of function. (R. at 460-61.)

On March 19, 2004, Jones's back was supple with full range of motion and no tenderness to palpation of the spine. (R. at 458-59.) On March 29, 2004, Jones reported difficulty with sleep onset, frequent awakening, mood swings and irritability. (R. at 389-90.) Dr. Adkins indicated that these symptoms may be complicated by some menopausal symptoms. (R. at 389.) On June 11, 2004, Jones's back and neck were supple with full range of motion. (R. at 451.) Jones complained of gastroenteritis symptoms. (R. at 451.) She was diagnosed with diverticulitis of the colon. (R. at 452.) On June 15, 2004, Jones continued to complain of abdominal pain. (R. at 446.) On July 14, 2004, Jones reported that her diverticulitis had resolved. (R. at 442.) She complained of anxiety, and it was noted that she had not been taking her medication. (R. at 442.) On July 26, 2004, Jones voiced no complaints. (R. at 441.) On August 16, 2004, Jones complained of problems with weight gain and difficulty sleeping. (R. at 439.) Dr. Larry T. Wilson, M.D., reported that Jones's difficulty sleeping could be due to poorly-controlled depression. (R. at 439.) On September 8, 2004, Jones reported that she was doing well. (R. at 438.) She voiced no complaints. (R. at 438.) On November 18 and December 20, 2004, and January 31, 2005, Dr. Wilson found that Jones walked with a steady gait and was free of acute injury. (R. at 426, 428, 431.) She had full range of motion and denied pain with movement. (R. at 426, 428, 431.) Dr. Wilson reported that Jones was oriented and had a normal affect and demeanor. (R. at 426, 429, 432.)

On March 2, 2005, Jones complained of stomach pain. (R. at 424-25.) She was diagnosed with diverticulitis of the colon. (R. at 424.) On July 7, 2005, Jones was diagnosed with back strain/muscle spasm. (R. at 421.)

The record shows that Jones saw Dr. Lauren Franklin, M.D., from March 2006 through January 2008 for a rash, hypertension, diabetes mellitus and gynecological issues. (R. at 326-27, 333-34, 340-41, 346-47, 351-52, 359-60, 363-64, 368-69, 371-72, 376-77, 378-79, 382-83, 384-85.) Jones's hypertension was controlled with medication, and her diabetes was controlled with diet. (R. at 326-27, 340-41.) During this time, Dr. Franklin reported that Jones had a normal affect and demeanor. (R. at 334, 347, 352, 360, 364.) On April 5, 2006, Jones underwent a bone mineral density, ("BMD"), test, which indicated that Jones was osteopenic and that her fracture risk was moderate. (R. at 240, 242-47.)

On February 26, 2008, Jones reported that she was considering filing for disability due to her inability to bend, squat or lift items weighing greater than 15 pounds. (R. at 324-25.) She complained that her "nerves" had been bothering her. (R. at 324.) Jones stated that she cried easily, felt sad and was anxious. (R. at 324.) Dr. Franklin reported that Jones had a normal affect and mildly depressed mood. (R. at 325.)

On November 17, 2008, Jones saw Dr. Franklin for complaints of depression and poor energy. (R. at 399-400.) Dr. Franklin reported that Jones's mood was depressed, and she had a slightly flat affect. (R. at 400.) On December 22, 2008, Jones reported that her blood pressure was controlled with medication and that her mood improved with medication. (R. at 535.) The treatment note indicates a "return to work," and that Jones was unable to serve on jury duty due to a medical condition which caused her to frequently have to go to the bathroom. (R. at 535.) On February 25, 2009, Dr. Franklin noted that Jones was in no acute distress, and

her psychiatric examination was normal. (R. at 534.) On April 27, 2009, Jones reported that she was doing well on medication. (R. at 543.) On June 18, 2009, Jones complained of a "pulling" sensation in her abdomen resulting from scar tissue. (R. at 559.) Dr. Franklin noted that Jones's affect and demeanor were normal. (R. at 560.)

On September 21, 2009, Jones reported that her memory was not good due to depression and anxiety. (R. at 556.) She reported that she had difficulty completing complex tasks and relating to co-workers and supervisors. (R. at 556.) She stated that her husband had recently been diagnosed with prostate cancer, which was causing her a lot of stress. (R. at 556.) She had a mildly flat affect and depressed mood. (R. at 557.)

That same day, Dr. Franklin completed a mental assessment, indicating that Jones was slightly limited in her ability to understand and remember simple instructions. (R. at 548-50.) She reported that Jones had a satisfactory ability to carry out simple instructions. (R. at 548.) Dr. Franklin reported that Jones was seriously limited in her ability to make judgments on simple work-related decisions, to understand and remember complex instructions and to interact with the public, supervisors and co-workers. (R. at 548-49.) She also noted that Jones had no useful ability to carry out complex instructions, to make judgments on complex work-related decisions and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 548-49.) Dr. Franklin indicated that Jones would miss more than two days of work per month. (R. at 550.)

Dr. Franklin also completed a medical assessment, indicating that Jones could occasionally lift items weighing up to 15 pounds and frequently lift items weighing up to five pounds. (R. at 551-53.) She found that Jones could stand and/or walk a total of one hour in an eight-hour workday and that she could do so for up to 15 minutes without interruption. (R. at 551.) Dr. Franklin found that Jones could sit a total of 30 minutes in an eight-hour workday and that she could do so for up to 15 minutes without interruption. (R. at 552.) She found that Jones should never climb, stoop, kneel, crouch or crawl and only occasionally balance. (R. at 552.) She reported that Jones's abilities to reach, push and pull were affected. (R. at 552.) Dr. Franklin noted that Jones would be restricted from working around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes and vibration. (R. at 553.)

On April 30, 2010, Dr. Eldridge Burns, M.D., found that Jones's psychiatric examination was within normal limits. (R. at 574-76.) On June 7, 2010, Dr. Burns found that Jones was in no acute distress. (R. at 571.) He found that Jones's insight and judgment were intact and that she had normal affect. (R. at 571.)

On June 24, 2004, Jones was admitted to Wellmont Holston Valley Medical Center for nausea, vomiting and abdominal pain. (R. at 220-25.) She was discharged on June 30, 2004, with a diagnosis of diverticulitis with small sigmoid diverticular abscesses and gastroesophageal reflux disease. (R. at 220.) On July 8, 2004, Jones reported that she was feeling better, eating well and had no further abdominal pain. (R. at 236.) A CT scan of Jones's pelvis showed that her diverticulitis was resolving. (R. at 239.)

On July 8, 2004, Dr. Steven M. Holt, M.D., saw Jones for follow-up. (R. at 236.) Jones reported that she was feeling much better and denied abdominal pain. (R. at 236.) Dr. Holt ordered a CT scan of Jones's abdomen, which showed tiny hypodense focus in the posterosuperior segment of the right hepatic lobe and possible cholelithiasis. (R. at 238-39.) A CT scan of Jones's pelvis showed resolving acute sigmoid diverticulitis. (R. at 239.) A barium enema performed on October 27, 2004, showed colonic diverticulosis, most prominent in the sigmoid area. (R. at 237.)

On October 8, 2004, Jones underwent a colonoscopy to evaluate her diverticulosis. (R. at 230-35.) The colonoscopy showed extensive diverticulosis throughout, and she had a bend in her colon, which prevented the colon from opening up. (R. at 230-31.) The procedure was terminated. (R. at 231.)

On April 17, 2007, Jones was hospitalized for possible acute renal failure, abdominal pain, diverticulitis and gallbladder inflammation. (R. at 249-71.) Jones underwent a partial colectomy with double bag colostomy, abscess drainage and cholecystectomy. (R. at 251-53.) During her admission, Jones had an echocardiogram, which was deemed normal. (R. at 263.) Jones was discharged on April 30, 2007. (R. at 249.) On May 3, 2007, Jones was contacted by Amedisys Home Health of Duffield to arrange physical therapy services. (R. at 265.) Jones refused physical therapy services, stating that she did not need therapy because she was doing all previous activities of daily living independently, with the exception of getting in and out of bed. (R. at 265.) Jones received follow-up treatment from Dr. Thomas V. Thomas, M.D. (R. at 300-08.) On May 3, 2007, it was noted that

Jones had made a "dramatic recovery" and was "doing quite well." (R. at 307.) On June 25, 2007, Dr. Thomas performed a colonoscopy and recommended that Jones's left colon be removed because it was markedly strictured. (R. at 304.)

On August 6, 2007, Dr. Thomas noted that Jones was doing well. (R. at 303.) She reported that she "finally feels good again." (R. at 303.) On August 30, 2007, Jones reported that she had been working "a bit lately" as a caregiver. (R. at 302.) Dr. Thomas reported that Jones's left colon was severely stenotic, and he recommended a resection of the rest of the left colon and a colostomy closure. (R. at 302.) On September 25, 2007, Jones was admitted for a laparotomy with a very extensive lysis of adhesion, take-down of a mucous fistula and colostomy and left colon resection. (R. at 285-98.) Jones was discharged on October 7, 2007, with a restriction of not lifting items weighing more than 15 pounds. (R. at 285.) On October 15, 2007, Jones reported that she was doing well. (R. at 300.) Dr. Thomas noted that Jones did not have much colon left and that it would take some time for her to adapt. (R. at 300.) He noted that Jones could expect frequent bowel movements for the next year or so and restricted her to no heavy lifting for several months. (R. at 300.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a

severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2013).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Jones argues that the ALJ erred by making incomplete findings at step three of the sequential evaluation process. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) In particular, Jones argues that other than a reference to her testimony, the ALJ provided no further support or explanation in finding that she had only a mild restriction in her ability to perform activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (Plaintiff's Brief at 4-5.) Jones also argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Brief at 5-7.) Jones argues

that the ALJ rejected the opinions of Dr. Franklin, gave only limited weight to the state agency physicians and formulated her own conclusions as to Jones's limitations. (Plaintiff's Brief at 6.) Jones further argues that the ALJ erred by determining that a significant number of jobs existed in the economy that she could perform. (Plaintiff's Brief at 7-8.) Jones contends that the vocational expert identified only one occupation that the hypothetical individual could perform. (Plaintiff's Brief at 8.)

The ALJ found that the medical evidence established that, through the date last insured, Jones suffered from severe impairments, namely shoulder and back pain, diverticulosis, torn meniscus of the left knee, status-post left knee arthroscopy with debridement of the lateral meniscal tear, depression, left ankle fracture and obesity, but she found that Jones did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ also found that, through the date last insured, Jones had the residual functional capacity to perform a limited range of simple, noncomplex light work that did not require her to climb, lift overhead or operate foot controls with her lower extremities and that did not require no more than occasional reaching overhead, crouching, crawling and stooping. (R. at 15.) Based on my review of the record, I find that substantial evidence exists in the record to support this finding. I also find that substantial evidence exists to support the ALJ's weighing of the medical evidence.

The period relevant to this disability claim is March 1, 2004, Jones's alleged date of disability, through December 31, 2004, Jones's date last insured. Prior to Jones's date last insured, the diagnostic and clinical findings were minimal and the

treatment conservative. In 1999, Dr. Vaughn found only mild arthritic changes of Jones's lumbosacral spine and a normal x-ray of her cervical spine. (R. at 506.) Dr. Vaughn found only tenderness in the trapezial musculature that he treated with an injection of Celestone and Lidocaine. (R. at 508.) Jones reported relief after this injection, as well as from physical therapy and taking Norflex and Naprosyn. (R. at 506.) It was not until three years later, in December 2002, that Jones complained again of arthritic type pain to a nurse practitioner, who prescribed Celebrex, which resolved Jones's back pain. (R. at 492, 499.) On examination in February 2003, Jones was able to move all extremities with full range of motion and no pain. (R. at 490.) On March 19, 2004, Jones had full range of motion of her back and no tenderness to palpation of her spine. (R. at 459.) In June 2004, Jones's back and neck were supple with full range of motion. (R. at 451.) On November 18 and December 20, 2004, Dr. Wilson noted that Jones had full range of motion and denied any pain with movement. (R. at 428, 431.)

Jones reported doing well following surgical repair of a torn meniscus in her left knee in April 2003. (R. at 479.) She recovered from her ankle fracture of October 2003 and reported in January 2004 that her fracture was clinically healed and that she had returned to her previous level of function. (R. at 461.)

The record shows that Jones had an exacerbation of diverticulitis attributed to a new medication. (R. at 446.) When the medication was discontinued and new medications were introduced, Jones reported feeling much better, eating well and denied abdominal pain. (R. at 236.) A CT scan of Jones's pelvis on July 12, 2004, confirmed that her diverticulitis was resolving. (R. at 239.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v.*

*Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ accommodated any effect on Jones's ability to concentrate due to pain from diverticulitis or mild arthritis by finding that she could perform only noncomplex tasks. (R. at 60.) The vocational expert testified, that with this limitation on concentration, in addition to the limitation on postural activities, Jones could perform the job of short order cook. (R. at 60-61.) In addition, the vocational expert identified unskilled jobs that Jones could perform, including jobs as a food preparer, a dining room and cafeteria attendant and a packer. (R. at 61.) The ALJ noted that Jones was not entirely forthcoming about the extent of her work activity after she retired from her job of school cook in 1999. (R. at 23.) The ALJ noted that Jones reported on April 10, 2000, that she had been caring for an elderly patient and the patient's wife, and on July 24, 2003, Jones complained about increased stress related to work. (R. at 23, 470, 504.) The ALJ noted that Jones had not sought or been referred for any psychological or psychiatric therapy, but had only asked her treating providers for medication to help her sleep and deal with her depression and anxiety. (R. at 21-22.) The ALJ noted that Jones responded positively to the medication and accommodated her depression by limiting her to simple tasks. (R. at 22.)

Jones argues that the ALJ erred by failing to give full consideration to the findings of Dr. Franklin. (Plaintiff's Brief at 6.) The record shows that Dr. Franklin did not start seeing Jones until March 2006, more than a year after Jones's date last insured. (R. at 384-85.) Therefore, Dr. Franklin's 2009 assessments, completed five years after Jones's date last insured, is not relevant to the time period that the ALJ adjudicated. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§

404.101(a), 404.131(a); *Johnson v. Barnhart*, 434 F.3d 650, 655-56 (4th Cir. 2005) (holding that a claimant must prove she is disabled before the expiration of her insured status). The ALJ noted that, prior to the date last insured, Jones was regularly found to be in no acute distress, to be fully ambulatory with a normal gait, to have full range of motion of her back and extremities and to have a normal affect. (R. at 24.) Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding that Dr. Franklin's opinion was not supported by the medical findings during the period of March 1, 2004, and December 31, 2004.

I also find that there is no merit to Jones's argument that the ALJ did not identify a significant number of jobs that exist in the national economy that she could perform because "[o]ne occupation would not constitute work that exists in significant numbers." (Plaintiff's Brief at 8.) The Fourth Circuit has suggested in dicta that 110 jobs in the local economy would not constitute an insignificant number of jobs. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979). The Third Circuit has held that lesser numbers than those specified by the vocational expert in this case constitute a significant number of jobs. *See Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (finding 200 jobs to constitute a significant number). Here, the vocational expert testified that 90,000 short order cook jobs exist in the national economy, and 2,500 exist in Virginia. (R. at 59.) In addition to the short order cook job identified, the vocational expert testified that other jobs existed in significant numbers that Jones could perform, including jobs as a food preparation worker, a dining room and cafeteria attendant, a packer, an assembler and an inspector, tester and sorter. (R. at 61-62.) Thus, I find that the ALJ's finding that Jones could perform a significant number of jobs is supported

by substantial evidence.

It is for all of these reasons that I find that substantial evidence supports the ALJ's finding that Jones was not disabled and not entitled to DIB benefits for the time period of March 1, 2004, through December 31, 2004.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the Commissioner's weighing of the medical evidence;

2. Substantial evidence exists to support the Commissioner's residual functional capacity finding;

3. Substantial evidence exists to support the Commissioner's finding that a significant number of jobs existed that Jones could perform during the time period of March 1, 2004, through December 31, 2004; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Jones was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Jones's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:	February 4, 2014.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE